The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTOPHER ODDO, HARRY HYADUCK, SR., LARRY KAHHAAN and GERALD DWYER, SAM MARCUS, on behalf of themselves and all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>T-MOBILE USA INC,<br><br>Defendants. | No. 2:25-cv-01651-RAJ<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION |

Defendant T-Mobile USA, Inc. enacted a scheme to lure in customers by promising them a guaranteed lifetime rate for their cell phone service. Defendant then knowingly defrauded their own customers by raising the cost of their cell phone plans despite the guaranteed rate they promised. In an effort to avoid responsibility for its actions, Defendant seeks to force Plaintiffs into arbitration by relying on their service agreement and Terms & Conditions (the "T&Cs"). In support of this argument, Defendant asserts that Plaintiffs each agreed to the terms of an arbitration/class action waiver provision (the "Provision").

Defendant's analysis, however, is flawed; it starts halfway up the mountain and ignores the steps needed to get there. Defendant starts its analysis having already determined without any support or discussion that the Terms & Conditions—which contain the Provision—are incorporated by reference into the service agreement (the "Service



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Agreement") that Plaintiffs allegedly signed. Before the Court can get to the analysis that Defendant posits, it must make the determination that the Terms & Conditions are incorporated by reference into the Service Agreement. Defendant's failure to address this argument is fatal to its motion.

Defendant has not met its burden of demonstrating that the T&Cs were incorporated into the purported contracts with Plaintiffs, Oddo, Kahhan, and Marcus because Defendant fails to produce agreements from the time they allegedly activated their service. Without signed Service Agreements, it is impossible to determine whether the then-applicable T&Cs—including any arbitration provisions—could have been incorporated by reference. General statements about what Plaintiffs would have signed, and about what terms their contracts would have contained, are insufficient to establish that Plaintiffs agreed to arbitrate. Moreover, there is no evidence that Plaintiffs were provided the opportunity to review the terms and conditions prior to signing the Service Agreement either in person or on the tablet at the store. Because Plaintiffs never had a reasonable opportunity to review the terms of the Service Agreements sufficient to constitute knowledge and assent, they could not have agreed to them; contrary to Defendant's reasoning, the fact that they later paid bills does not correct this contract formation deficiency.

Second, Defendant's Service Agreement makes it impossible for customers to opt out, making it an unenforceable illusory contract. Contrary to Defendant's arguments, customers have no real ability to opt out of the Service Agreement and T&C because, according to Defendant, Plaintiffs were required to opt out for *every* line of service or device or product they purchased—and, even after opting out, were also required to continually repeat this process every time T-Mobile adopted new T&Cs—demonstrating the illusory nature of the opt out process. Further, a customer cannot opt out of arbitration prior to activating a line of service by signing a Service Agreement. Thus, by virtue of simply activating a line of service, a customer has *already* agreed to arbitration. Defendant provides no explanation how opting



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

out of arbitration is even possible if a customer must accept their T&Cs before being given an opportunity to opt out. The opt out provision is also illusory because customers receive confirmation from Defendant that their opt outs were processed regardless of when the opt out was submitted to Defendant, leading customers to believe they validly opted out of arbitration.

Third, Plaintiff Marcus timely opted out for numerous phone lines on his account. Defendant does not dispute this fact. However, Defendant refuses to let Marcus proceed with his claims based on incorrect facts certified by Defendant's representative. As for Plaintiffs, Hyaduck, Kahhan, and Oddo, disputed factual issues preclude this Court from compelling arbitration. Defendant seeks to have this Court rely upon its version events, including a Declaration from an employee and cherry-picked documents, as gospel without permitting Plaintiffs any opportunity to challenge those alleged facts and documents through discovery. Plaintiffs have sought discovery to challenge Defendant's one-sided version of events, but Defendants have refused to respond.[1] All this does is create numerous material issues of fact that preclude this Court from granting Defendant's motion.

For the reasons set forth above, Defendant's motion to compel arbitration must be denied.

## FACTUAL BACKGROUND

### A. T-Mobile's Conduct

At the time when T-Mobile publicly made its price-lock guarantee, the company was providing wireless services to 71.5 million customers through T-Mobile and Metro PCS brands. First Amended Complaint ("FAC") ¶ 7. However, in 2020, T-Mobile and Sprint completed their merger, making T-Mobile the country's second largest of only three

[1] For the reasons set forth in Plaintiffs' opposition to Defendant's Motion to Stay, discovery should not be stayed on any issues, but certainly should not be stayed regarding discovery related to arbitration.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

nationwide cell phone networks. To obtain regulatory approval, T-Mobile pledged not to raise rates for three years. *Id.* ¶ 8. Indeed, for certain plans, the rates were guaranteed to last for life, as long as the customer wanted to remain with that plan. *Id.* ¶ 4. In May 2024, T-Mobile unilaterally did away with these legacy phone plans, reneging on its promises to customers and raising rates for all the plans that were promised to be price-guaranteed for life. *Id.* ¶¶ 4, 9.

**B. Experiences of the Plaintiffs**

Plaintiff Chris Oddo, a citizen of New Jersey, was a T-Mobile customer since 2010; but after seeing a January 5, 2017 press release that indicated that T-Mobile will never change the price you pay for your T-Mobile ONE Plan, he signed up for the 2 Lines ONE Plan with "All In." *Id.* ¶ 14. Despite T-Mobile's promises, on May 22, 2024, T-Mobile advised Oddo that it was raising his rates by $5 per line per month. This violated the price lock guarantee. *Id.* ¶¶ 16–17. Oddo filed a complaint with the FCC, to which T-Mobile responded that it was making a "small adjustment to the pricing" of some plans, and that customers could request to have their final months' qualifying service charge reimbursed if they decided to cancel their plan. T-Mobile has breached its agreement with Oddo by virtue of its false representations and bait and switch tactics. *Id.* ¶¶ 18–21.

Harry Hyaduck, a citizen of Georgia, who had been a Sprint customer since May 14, 2000, switched to a T-Mobile Magenta®1.0 Military Plan after seeing a television commercial advertising that he was eligible for a plan that would never increase in price and could only be cancelled at his option. He paid $100 per month for four lines until July 5, 2024, when his plan increased to $120. He was told when he called customer service that he understood the plan correctly, but they were increasing their price anyway. *Id.* ¶¶ 22–26.

Larry Kahhan a citizen of Nevada, who was already a T-Mobile customer, switched to the ONE Plan Unlimited 55+ in August 2017 after seeing the video announcement by CEO John Legere. He paid $60 a month through June 14, 2024. However, in May 2024 he received



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

a text message advising him of a price increase to $70 a month. Kahhan has complained to numerous state and federal authorities to no avail. *Id.* ¶¶ 27–33.

Gerald Dwyer, a citizen of Pennsylvania, switched from AT&T to T-Mobile in person at a kiosk in Costco in 2017 after hearing that the 55+ rate plan would only cost $60 for two lines and the price would never change. After having this Plan for seven years, he was notified of a rate increase via text message. He is now being charged an additional $10 a month, contrary to the promised terms. *Id.* ¶¶ 34–37.

Sam Marcus, a citizen of New York, switched from his exiting Simple Choice Unlimited Talk Text and Data Plan to a ONE plan because of T-Mobile's promise that his rate would never increase under the ONE plan. *Id.* ¶ 39. Marcus also added additional lines for family members because of the promise that his rate would never increase. *Id.* ¶ 40. Each time Marcus has contacted T-Mobile to add additional lines or to take advantage of a promotion, he has asked whether doing so would cause an increase in rate and has been assured his rate was locked. *Id.* ¶ 41. Despite those promises, in Spring 2025, Marcus' ONE plan increased by a fee of $5 per month, per voice line on the account, which is contrary to the promised terms. *Id.* ¶ 42. Marcus has timely opted out of the mandatory arbitration provision and class action waiver for most of the voice lines on his account within 30 days of activation. *Id.* ¶ 46; *see also* Decl. of Sam Marcus ("Marcus Decl.") ¶¶ 3–9.

T-Mobile has engaged in deceptive, unconscionable, fraudulent and misleading practices in advertising, promoting, marketing and selling its lifetime promise to maintain rates. T-Mobile intentionally concealed its plan to raise rates from Plaintiffs and other members of the Nationwide Class and State Subclasses.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

## ARGUMENT

### I. Defendant Has Not Demonstrated That Plaintiffs Had a Reasonable Opportunity to Review the Terms and Conditions Before Signing the Service Agreement

It is axiomatic that "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). As such, before compelling a party to arbitrate, a court must determine that (1) there is an agreement to arbitrate, and (2) the dispute falls within the scope of that agreement. *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013). Whether a valid agreement to arbitrate exists—as well as disputes concerning contract formation—are subject to judicial determination. *Johnson v. Walmart Inc.*, 57 F.4th 677, 680 (9th Cir. 2023); *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010).

As the party seeking to compel arbitration, T-Mobile bears the "substantial" burden of "showing that the agreement exists and that its terms bind the other party." *Rocha v. Asurion, LLC*, 724 F. Supp. 3d 1213, 1218–19 (E.D. Wash. 2024) (internal quotation omitted). "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Kaplan*, 514 U.S. at 944. A motion to compel arbitration is subject to the summary judgment standard. *Gonzales v. Rose Hills Co.*, 2026 WL 312166, at *1 (9th Cir. Feb. 5, 2026).[2]

[2] The arbitration provisions in the T&Cs provide that the "Federal Arbitration Act and federal arbitration law, not state law, apply and govern the enforceability of this dispute resolution provision (despite the general choice of law provision set forth below)." Dkt. 72-38 at 10. However, a court "[cannot] apply [a] contract's choice-of-law provision to [] contract-formation question[s] because the choice-of-law provision presupposes the existence of a validly formed contract." *Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169, 173 (4th Cir. 2025). Accordingly, Plaintiffs follow the relevant state laws, which are substantially similar regarding contract formation and incorporation by reference.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

An agreement to arbitrate—like any other agreement—requires mutual assent. *See Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 600 (3d Cir. 2020); *see also, e.g.*, *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 2023 WL 5301426, at *2 (W.D. Wash. July 17, 2023). When an agreement to arbitrate is based on terms incorporated by reference, "it must be clear that the parties to the agreement **had knowledge of and assented to the incorporated terms.**" *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (internal quotation omitted) (emphasis added).[3]

Importantly, incorporated terms must be presented to the party being compelled to arbitrate *prior to his entering an agreement* because "**[a] party cannot manifest assent to terms and conditions of a contract prior to having an opportunity to review them; a party must be given some opportunity to reject or assent to proposed terms and conditions prior to forming a contract.**" *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 430–31 (2d Cir. 2004) (footnote omitted) (emphasis added). Thus, "[f]or knowledge to be imputed [to] the [person being compelled to arbitrate, he] **must have been given the incorporated document or specifically directed to it in such a way that there was a real opportunity to read its terms**." *Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401, 423 (D.N.J. 2018), *aff'd*, 959 F.3d 590 (3d Cir. 2020) (emphasis added).[4]

This is equally true when, as here, the terms and conditions alleged to have been incorporated by reference were merely presented as a link to a website within the physical

[3] *See also, e.g.*, *Bacon*, 959 F.3d at 600; *cf. Moran Indus., Inc. v. Netherlands Ins., Co.*, 2014 WL 643723, at *5 (M.D. Pa. Feb. 19, 2014); *Stuebe v. S.S. Indus., LLC*, 2018 WL 3496614, at *2 (W.D. Wash. July 20, 2018); 11 *Williston on Contracts* § 30:25 (4th ed. May 2025 update).

[4] *See also, e.g.*, *Bacon*, 959 F.3d at 601 (quotation omitted) ("[A] party cannot be required to arbitrate without its assent . . . and a party cannot assent to something he does not know exists"); *Stuebe*, 2018 WL 3496614, at *2 (quotation omitted) (document may be incorporated by reference so long as it is "readily available for inspection"); *Vincent v. Nat'l Debt Relief LLC*, 2024 WL 3344227, at *6 (S.D.N.Y. July 8, 2024) ("If the user is not on notice of the existence of terms and conditions prior to taking the specific action that would constitute assent, then there can have been no meeting of the minds and no contract").



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

document allegedly signed by Plaintiffs. *See, e.g.*, *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011) (incorporation by reference established where there was "adequate notice of and opportunity to review" incorporated terms contained on party's website); *Shepherd v. E*TRADE Sec. LLC*, 2026 WL 27824, at *9 (E.D. Pa. Jan. 5, 2026) (compelling arbitration when the "pamphlet not only provided a hyperlink but typed-out web addresses for the Amended Agreement [being incorporated] and Plaintiffs had sufficient time to identify and review the Amended Agreement").

Here, Defendant argues that Plaintiffs must be compelled to arbitrate their claims because their respective contracts each incorporated by reference arbitration provisions contained in T-Mobile's then-applicable T&Cs. This argument fails for a host of reasons.

Initially, Defendant has not met its burden of demonstrating that the T&Cs were incorporated into the purported Service Agreements with Plaintiffs Oddo (when he activated service in December 2011, *see* Dkt. 72 ¶¶ 69–70), Hyaduck (when he activated service with Sprint in May 2020, *see* Dkt. 69 ¶ 22), Kahhan (account ending in 3421, *see* Dkt. 72-3 at 1; Dkt. 72 ¶¶ 79–81), or Marcus (account ending in 9597, *see* Dkt. 72-5 at 1; Dkt. 72 ¶¶ 90–91), because it fails to produce service agreements from when they first allegedly activated their service. The Court cannot assume the terms of a contract. Without signed service agreements, it is impossible to determine whether the then-applicable T&Cs—including the Provision—could have been incorporated by reference. *See In re T-Mobile 2022 Customer Data Sec. Breach Litig.*, 2026 WL 493643, at *7 (W.D. Mo. Feb. 9, 2026) (unsigned Service Agreements with T-Mobile insufficient to demonstrate that plaintiff had notice of or assented to T&Cs incorporated by reference).

Indeed, as to Plaintiff Kahhan, T-Mobile produces no signed agreement **at all.** Instead, T-Mobile relies on general allegations regarding what each Plaintiff "would" have signed to activate their accounts. *See, e.g.*, Dkt. 72 ¶ 91 ("Per T-Mobile's regular practice and procedure, Plaintiff Marcus would not have been able to activate the line of service in



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

February 2016 if he did not sign a Service Agreement or otherwise accept and agree to T-Mobile's Terms and Conditions."); *id.* ¶ 80 ("As with other T-Mobile authorized retailers, Plaintiff Kahhan would have been required to sign a written agreement at the Costco store that incorporated by reference the T-Mobile Terms and Conditions in effect at the time in order to activate service."). General statements about what Plaintiffs would have signed, and about what terms their contracts would have contained and/or incorporated, are insufficient to carry T-Mobile's burden. Furthermore, Defendant's argument contradicts the facts set forth in the supporting Sanchez Declaration. The Sanchez Declaration does not state that Kahhan's Service Agreement contained an *express* arbitration provision. Rather, it merely states that Kahhan would have been required to sign an agreement that "incorporated by reference the T-Mobile Terms and Conditions in effect at the time." *Id.*; *see also* Dkt. 70 at 23 (emphasis added) (arguing that Plaintiffs "signed contracts containing express arbitration agreements **and/or** incorporating T-Mobile's T&Cs"). Without evidence of what the Service Agreement language was, there is no competent factual support for Defendant's position that a contract exists, that it contained an arbitration provision, or whether the T&Cs were incorporated by reference.

Worse, T-Mobile has *recently* demonstrated that it permits services with unsigned agreements. *See In re T-Mobile 2022 Customer Data Sec. Breach Litig.*, 2026 WL 493643, at *7 (noting that T-Mobile's allegation that service is impossible without a signed agreement "is contradicted by the fact that the Service Agreements presented to the Court are unsigned."). Nor does it provide any evidence that any sales associate informed them of the alleged terms of arbitration. *Id.* ("Moreover, T-Mobile provides no evidence the sales associate informed Oliver of the terms or arbitration."). T-Mobile's *sole* alleged evidence of a supposed agreement to arbitrate when these Plaintiffs first activated their service is T-Mobile's say-so of what "would have been required." That is not sufficient to compel arbitration.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

*Ohanian v. Apple Inc.*, 2021 WL 871501, at *3 (S.D.N.Y. Mar. 9, 2021) is instructive. In *Ohanian*, Defendant, represented by the same counsel, sought to compel arbitration by presenting evidence of its regular practices; but while T-Mobile provided the court notice of its terms of service, "[t]he Form that T-Mobile asserts 'would have' been provided to Ohanian contains no information identifying the recipient." *Id.* Importantly, the court also noted "T-Mobile attests to a 'regular practice and procedure' of requiring customers to agree to the T&Cs when they activate a line of service; but T-Mobile has not offered evidence to show that Ohanian could not have gotten T-Mobile service without such an agreement." *Id.* The court thus ordered a trial. *Id.* at *5. The court ultimately determined, after an evidentiary hearing, that T-Mobile **had not** met its burden to show that it provided Ohanian the prepaid confirmation form, which contains the arbitration agreement. *Id.* at *1–*2. It thus denied the motion to compel. *Id.*

The same result should occur here. T-Mobile has failed to provide the original service agreements signed by Plaintiffs Oddo, Hyaduck, Kahhan, and Marcus when they originally activated their service. This failure is fatal to Defendant's agreement that these plaintiffs agreed to arbitration. While T-Mobile presents a sworn declaration indicating that an exemplar agreement *must* have been signed, that statement is contradicted by the fact that T-Mobile has been unable to produce a copy of a signed agreement with Plaintiffs.

All Defendant can rely upon are Service Agreements entered into years after they initially signed up for cell phone service. These agreements are not sufficient to establish that Plaintiffs agreed to arbitrate. With respect to Plaintiffs Oddo, Hyaduck, and Dwyer, they were each given Service Agreements that included a link to T-Mobile's website, where the T&Cs were allegedly available. *See* 72-16; 72-29; and 72-33.[5] The Service Agreements did not

---

[5] The single exception is one of Hyaduck's accounts—whose account number is blacked out—which states that arbitration is required unless the customer previously opted out and does not contain a hyperlink. *See* Dkt. 72-28 at 1.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

include any adequate reference or mention of arbitration. Oddo hand signed his Service Agreement in March 2017, indicating that he signed up for his account in person. Dkt. 72-16. The Service Agreements which Hyaduck and Dwyer signed contain signatures above which it is written "DocuSigned by," indicating they signed on electronic tablets in person. *See* Dkt. 72-29; Dkt. 72-33. Defendant provides no facts from which it can demonstrate that it provided these plaintiffs with a reasonable opportunity to review the terms and conditions containing the Provision prior to them signing their Service Agreement. For example, because Oddo signed by hand in person, T-Mobile would have had to provide him the opportunity to review the T&Cs online on another device prior to his signing the Service Agreement. There is no evidence in the record that this occurred. Similarly, there is no evidence that Hyaduck and Dwyer were provided with the opportunity to review the terms and conditions prior to signing the Service Agreement on the tablet at the store. *See In re T-Mobile 2022*, 2026 WL 493643, at *7 ("T-Mobile fails to demonstrate that notice of the Terms and Conditions was given to [plaintiffs] . . . by some other means."). As it has failed to do recently, Defendant "has not demonstrated acceptance" by Plaintiffs Oddo, Hyaduck, Kahhan, Dwyer, or Marcus at the time they began their T-Mobile service. *Id.*

Defendant's reliance on Plaintiffs paying bills during the term of their contract does not alter any of this analysis. If Plaintiffs never had a reasonable opportunity to review the terms of the Service Agreement sufficient to constitute knowledge and assent, the fact that they later paid bills does not correct this contract formation deficiency. *See Hirsch v. Citibank, N.A.*, 542 F. App'x 35, 37 (2d Cir. 2013) (quotation omitted) ("Mere acceptance of a benefit can constitute assent, but only where the offeree makes a decision to take the benefit with knowledge [actual or constructive] of the terms of the offer."). *Franck v. T-Mobile USA, Inc.*, 2024 WL 4188971, at *2 (W.D. Wash. Sept. 12, 2024), relied upon by Defendant for this argument, is inapposite. The issue in *Franck* was whether the *pro se* plaintiff had the capacity to enter into agreements. *Id.* There is no discussion by the court of acceptance of contractual



McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

terms through a person's conduct. Defendant also relies on *Gavrilovic v. T-Mobile USA, Inc.*, 2022 WL 1086136, at *4 (E.D. Mich. Mar. 25, 2022). *Gavrilovic* also has no bearing on the issues here because, unlike this case, there was no dispute that plaintiff accepted the terms when he originally opened his account under Sprint.

Defendant also cannot rely on text messages, emails, and bills sent to Plaintiffs to compel arbitration. Notably, none of these text messages or emails mention arbitration or inform Plaintiffs that there is a way to opt out of the arbitration provision and how to do it. *See* Dkt. 72 ¶¶ 11–13, 23–25, 36–42. Nor did any of these notifications inform Plaintiffs that they had to read the updated T&Cs—or do anything else. The notifications merely stated, "Get the details and learn about your options." *Id.*; *see also* Dkt. 69 ¶¶ 29, 35. This imparts no information whatsoever and is certainly not sufficient to provide Plaintiffs with knowledge of the arbitration clauses.[6]

For these reasons, Defendant's motion to compel arbitration should be denied. Additionally, because there are numerous material issues of fact in dispute, at a minimum discovery is required to resolve these issues. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773–74 (3d Cir. 2013) (quotations and footnote omitted) ("[A] restricted inquiry into factual issues will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate . . . and [Plaintiffs] must be given the opportunity

---

[6] There is nothing in the T&Cs, or elsewhere in the record, which provides that Plaintiffs' claims are retroactively subject to updated T&Cs that were adopted after the inception of this litigation. *See, e.g.*, *Paxson v. Live Nation Ent., Inc.*, 778 F. Supp. 3d 1113, 1130 (D. Nev. 2025) (modification clause allowing defendant company to unilaterally modify terms, and providing that user agreed to the updated terms by using the site after new terms were posted, does not retroactively modify existing claims). Thus, Defendant's argument that Plaintiffs assented to arbitration by virtue of using T-Mobile's service and paying their bills after the complaint was filed is of no consequence because, even if correct, it would have no effect on Plaintiffs' *existing* claims. Defendant's reliance on *Vargison v. Paula's Choice, LLC*, is misplaced because, unlike here, the updated terms expressly provided for "arbitrat[ion] with [defendant] [of] "disputes or claims that arise *or have arisen.*"" 2025 WL 346197, at *2 (W.D. Wash. Jan. 30, 2025).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement[s].”).

**II. Defendant’s Service Agreement Is Illusory and Not Enforceable Because It Is Impossible for Customers to Opt Out**

Defendant’s service agreement is an illusory contract because customers have no real ability to opt out—and even if they do, Defendant can purportedly negate that by “updating” its terms and conditions, which, according to T-Mobile, rebinds the customer to its arbitration agreement despite the customer previously opting out. While *generally* a party’s failure to opt out is considered a challenge to the validity of a contract rather than its formation, “[w]here a party moving to compel arbitration—who bears the burden of demonstrating an agreement to arbitrate was formed—points to an opposing party’s failure to opt out as the **sole** evidence of assent, then the question is one of formation.” *In re T-Mobile 2022 Customer Data Sec. Breach Litig.*, 2026 WL 493643 at *6 (emphasis added). “In that scenario, if an opt-out provision is illusory, meaning it is technically impossible to opt-out, then the failure to opt out is not a manifestation of assent because the offeree had no choice.” *Id.*

**A. Defendant’s Opt Out Provision Is Illusory Because It Is Impossible For Customers To Opt Out**

The practical reality of T-Mobile’s opt out requirements makes it effectively impossible for a customer to opt out of arbitration, and thus Defendant’s contracts are illusory. Defendant’s argument that Plaintiffs were required to opt out for *every* line of service or device or product they purchased—and, even after opting out, were also required to continually repeat this process every time T-Mobile adopted new T&Cs—demonstrates the illusory nature of the Provision. Accordingly, Defendant’s motion to compel arbitration should be denied.

As noted above, an opt out provision is illusory when “it is technically impossible to opt-out.” *In re T-Mobile 2022*, 2026 WL 493643, at *6. When that is the case, “the failure to



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

opt out is not a manifestation of assent because the offeree had no choice." *Id.* T-Mobile's T&Cs provide that:

> **YOU MAY CHOOSE TO PURSUE YOUR CLAIM IN COURT INSTEAD OF BY ARBITRATION IF YOU OPT OUT OF THESE ARBITRATION PROCEDURES WITHIN 30 DAYS FROM THE EARLIER OF (1) THE DATE YOU PURCHASED A PRODUCT OR DEVICE FROM US OR (2) THE DATE YOU ACTIVATED A NEW LINE OF SERVICE (together, the "Opt Out Deadline").** You must opt out by the Opt Out Deadline for each line of Service.

Dkt. 72-38 at 10 (emphasis in original).[7] Relying on the final sentence of this paragraph, Defendant argues that opting out of any single line requires the customer to opt out of all his other lines and devices. In other words, opting out of arbitration on any *single* line is not actually an opt out unless the customer *also* opts out of arbitration on all his other lines and devices. That renders the opt-out on the newly activated line meaningless.

The problem arises when a customer can—and in this case, did—purchase a second line more than 30 days after purchasing their first line. What that means is that if the customer did not timely opt out for their first line but wanted to opt out when they purchased the second line, then *the customer is barred from opting out for his second line*. According to Defendant, since the customer chose not to opt out for his first line, the customer cannot opt out with regard to his second line (and any subsequent lines) which were purchased more than 30 days later (or even years later). The same is true for the purchase of any combination of lines and phones. Unless you opt out initially, you are barred from opting out for any subsequent purchase. Because Defendant makes it *impossible* for a customer to opt out in this scenario, the opt out clause is illusory and unenforceable. *See In re T-Mobile 2022*, 2026 WL 493643, at *7 (contract illusory when "it was impossible to opt out by the deadline" because "opting

---

[7] The quoted opt out provision comes from Defendant's August 1, 2025 T&Cs, which is materially similar to the earlier versions.



McNaul Ebel pllc
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

out was not permitted at that time," and therefore "failure to opt out cannot constitute assent"); *Lipsett v. Banco Popular N. Am.*, 2022 WL 17547444, at *8, *11 (S.D.N.Y. Dec. 9, 2022), *aff'd sub nom. Lipsett v. Popular Bank*, 2024 WL 111247 (2d Cir. Jan. 10, 2024) (emphasis in original) ("[T]he plain terms of the opt-out procedure in the 2008 PBD&A do not apply to [plaintiff], as they provide him *no* opportunity, much less a meaningful one, to opt out of arbitration . . . once [plaintiff] was unable to opt out under the 2008 PBD&A, no contract to arbitrate was formed, and [plaintiff] was not required to opt out again when BPNA amended the contract in or about January 2014 or thereafter.").

This scenario is precisely what happened to Plaintiffs here. The opt out provision for Plaintiff Oddo in 2017 was illusory. The Service Agreement Plaintiff Oddo allegedly signed in 2017 provided that he could opt out only "within 30 days of activation." *See* Dkt. 72 ¶ 72 (emphasis omitted). As Plaintiff Oddo had activated his T-Mobile account years before, he could not exercise this provision—and it was thus illusory. Likewise, Plaintiff Hyaduck could not have opted out of the arbitration provision in the 2021 T&Cs, which provided that a customer could opt out only within 30 days from "the earlier of the date you purchased a device from us or the date you activated a new line of service." *Id.* ¶ 48 (2021 Terms and Conditions) (emphasis omitted). Because his account was activated much earlier, Plaintiff Hyaduck could not exercise this provision, either.

The opt out provision for Plaintiff Marcus in November 2019 was also illusory—it provides that Plaintiff Marcus, as an existing customer, could opt out only if he "previously opted out pursuant to T-Mobile's Terms and Conditions." *Id.* ¶ 93 (emphasis omitted). Plaintiff Marcus could not have opted out of T&Cs he had never received. Because T-Mobile has failed to demonstrate that Plaintiff Marcus could have previously opted out of T-Mobile's Terms and Conditions, this provision was thus illusory as to him. For example, Marcus purchased lines between February 2016 and April 2025, and therefore opting out of all his subsequent lines was contingent on opting out of his first line within 30 days. *Id.* ¶¶ 97(a)–



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

(e). If he chose not to do that—or failed to properly opt out, as Defendant contends, *see* Dkt. 70 at 29—*there was never any set of facts* under which he could opt out of all his subsequent lines. That is the very definition of impossible.[8]

Nor, finally, could Plaintiff Kahhan have opted out of the 2021 or 2025 T&Cs, which similarly provided that a customer could opt out only within 30 days from "the earlier of the date you purchased a device from us or the date you activated a new line of service," Dkt. 72 ¶ 48 (2021 Terms and Conditions) (emphasis omitted), or "from the earlier of (1) the date you purchased a product or device from us or (2) the date you activated a new line of service," *id.* ¶ 18 (2025 Terms and Conditions). Importantly, T-Mobile's **only** evidence of Kahhan's assent to T-Mobile's terms and conditions is his failure to opt out and continue to use T-Mobile's services; T-Mobile failed to produce **any** signed agreement with Kahhan. Because Plaintiff Kahhan was never given the opportunity to opt out within 30 days of activating his service (insofar as there is no evidence that he ever received a copy of T-Mobile's then-existing terms and conditions), this opt-out provision was illusory as to him, as well. *In re T-Mobile 2022*, 2026 WL 493643, at *7 (refusing to compel arbitration as to plaintiff for whom T-Mobile could produce no signed agreement and explaining that "[w]hen an opt-out provision is ambiguous, meaning it is not possible to tell what the opt-out deadline is, or it is not possible to comply with the opt-out deadline, then it is unreasonable to conclude that the failure to opt out equals acceptance."); *see also Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1285 (D. Utah 2017) ("Wells Fargo's assertion that the conversion Plaintiffs' continued use of their accounts is sufficient to show assent to the terms, even assuming the conversion mailings were properly sent to and received by each of these Plaintiffs, falls flat in these circumstances, where the welcome letters do not mention new dispute resolution terms *or provide an option to opt-out*." (emphasis added)).

---

[8] The same is true for Oddo, Hyaduck, and Dwyer, all of whom purchased multiple lines and/or Equipment Installment Plan contracts. *See* Dkt. 72 ¶¶ 69–78, 86–89.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Defendant further argues that it is insufficient to timely opt out of arbitration within 30 days after initially purchasing service or a device. Instead, a customer must also continually opt out of arbitration for every line of service, and every device and product, **every time** T-Mobile updates its T&Cs regardless of whether the customer already opted out. This, too, renders the opt out provision illusory. Defendant does not point to anywhere in the T&Cs where customers are notified that they must continually opt out even if they did so already every time Defendant chooses to update its T&Cs. The emails and texts customers receive after T&Cs also fail to state that the customer must opt out of arbitration again (and continue doing so going forward). Rather, as explained above, these emails and texts merely state: "Get the details and learn about your options." Dkt. 72 ¶¶ 11–12. This lack of information from Defendant makes it impossible to opt out of arbitration, rendering the contract illusory. *See Lipsett*, 2022 WL 17547444, at *11 (explaining that requiring customers to opt out every time terms and conditions are updated and amended "entrench[es] customers in a perpetual cycle of needing to opt out every time").

Even for those customers who purchased only a single line, the opt out provision is still illusory. The T&Cs provide that, "By accepting these T&Cs, you are agreeing to resolve any dispute with us through individual binding arbitration or small claims dispute procedures (unless you opt out) . . . .". Dkt. 72-38 at 10. However, the T&Cs also provide—seven pages earlier—that, "You accept these T&Cs by doing any of the following: . . . **Activating, using, or paying** for a Service, Product, or Device . . . **If you don't want to accept these T&Cs, don't do any of these things.**" *Id.* at 3 (emphasis added). A customer cannot opt out of arbitration prior to activating a line of service by signing a Service Agreement. Thus, by virtue of simply activating a line of service, a customer has *already* agreed to arbitration. *See also* Dkt. 70 at 18 (arguing that Plaintiffs "agreed to be bound by T-Mobile's T&Cs . . . by activating, using, and paying for T-Mobile services"). Defendant provides no explanation



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

how opting out of arbitration is even possible if a customer must accept their T&Cs before being given an opportunity to opt out.

The opt out provision is further illusory by virtue of customers having to make payments—another form of acceptance—after T&Cs are updated. For example, T-Mobile's 2025 T&Cs became effective on August 1, 2025. Dkt. 72-38 at 1. Those T&Cs provide that "If a change to the terms of your Services, Product, or Rate Plan will have a material adverse effect on you, we will provide at least 14 days' notice of the change. **Your continued use or payment for your Services or Product after the effective date of the change means you have accepted the changes.**" *Id.* at 4 (emphasis added). Defendant states that "In July 2025, T-Mobile sent active account holders notice via email, SMS text message, or direct mail of the updated 2025 T&Cs." Dkt. 72 ¶ 10. This included sending such notices to Plaintiffs. *Id.* ¶ 11. It is impossible to tell whether this was more than two weeks prior to the 2025 T&Cs become effective, as specific dates are not provided. Oddo received a bill for the bill period of July 28, 2025–August 27, 2025. Dkt. 72-1 at 1. Thus, regardless of whether Oddo wanted to opt out of arbitration under the 2025 T&Cs, he must make a payment after August 1, 2025, and is thereby forced into accepting the new terms and conditions.[9]

Finally, the opt out provision is illusory because customers are able to submit an opt out at any time, and in response they receive confirmation from Defendant that their opt out was processed. *See* Boyd Decl. Exhs. A–E. Defendant provides customers with confirmations of their submitted opt outs regardless of when they are submitted. Defendant does not inform customers that their opt out is untimely. Thus, whether a customer opts out on the same day he opens his line, or more than 30 days later, a customer is notified that they have opted out.

---

[9] What's more, these two sentences, buried within 22 pages of dense text, do not actually state that a customer must opt out of arbitration *prior* to the effective date of the updated T&Cs. *See* Dkt. 72-38 at 10. Not only does this fail to inform customers that they must opt out by the updated T&Cs' effective date, it provides the false impression that customers have 30 days *after* the terms and conditions become effective to opt out.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

Customers have no way of knowing that Defendant will not recognize their opt out until they try and bring a lawsuit against Defendant. Defendant's process gives no indication that a customer needs to opt-out *again* if, for example, the T&Cs are updated, or if another line is activated, or if another device is purchased.

This is what occurred here. All Plaintiffs opted out at some point. For example, in response to Marcus's opt out, he received a text which states at the top in large letters, "**T-Mobile Opt Out – Submit Opt Out Conformation Confirmation.**" *See* Decl. of Kaleigh N. Boyd ("Boyd Decl.") Exh. E. Below that the text states:

> Thank you. Your opt out request has been processed and will be effective subject to the Terms & Conditions of your T-Mobile service.

*Id.*[10] Oddo, Hyaduck, Kahhan, and Dwyer received confirmations with identical language. *Id.* Exhs. A–D. Defendant now claims that none of these opt outs were valid. However, Plaintiffs were never informed that their opt outs were untimely and invalid after receiving these confirmations. It was therefore impossible for them to comply with the opt out provisions.

**B. Defendant's Interpretation of the Opt Out Provision Is Erroneous**

Even if, *arguendo*, the opt out provision is not illusory, Defendant's argument that a customer is required to opt out of arbitration for *all* his lines of service, as well as for *all* the products and devices he purchased, as a prerequisite for opting out of any *single* line of service is misplaced. As set forth above, Defendant relies on the final line of the opt out provision cited above: "You must opt out by the Opt Out Deadline for each line of Service." Dkt. 72-38 at 10. Contrary to Defendant's suggestion, a far more natural reading of that sentence is that a customer is required to opt out of each line of service separately, which makes sense.

---

[10] Despite this mention of T&Cs, Defendant does not give the customer the ability to click on the language and go to the T&Cs to understand what this means.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

In other words, the sentence informs customers that opting out of arbitration for any single line of service does not mean that you opted out of arbitration for all your other lines of service. This reading makes sense because the sentence is written in the singular and not the plural—it applies to "*each line* of service" and not "*all lines* of service."[11] What's more, the webpage containing T-Mobile's current opt out form states, "The information provided must be for the **specific** **T-Mobile line** of service that was activated within the last 30 days, for which you want to opt out."[12]

Defendant does not address this sentence and only supports its interpretation by arguing that "When Plaintiff Marcus accepted the Terms and Conditions . . . he agreed to arbitrate 'all claims and disputes between [him] and T-Mobile'—not just claims related to those particular lines." Dkt. 70 at 29 (quoting Dkt. 72-38 at 10) (footnote omitted). This argument fails.

The sentence quoted by Defendant is taken from three paragraphs above the relevant sentence in the opt out provision. The relevant paragraph provides:

> **ALL CLAIMS AND DISPUTES BETWEEN YOU AND T-MOBILE WILL BE RESOLVED BY INDIVIDUAL BINDING ARBITRATION OR IN SMALL CLAIMS COURT. THIS INCLUDES …**

Dkt. 72-38 at 10 (underlining added). In no way does this line—or this paragraph—support Defendant's interpretation. This language does not state that a customer can only opt out for a particular line of service by opting out of all his lines of service and for all his devices. Thus, Defendant's reliance on Plaintiffs' failures to opt out of arbitration for all their lines of service fails.

---

[11] Nor does the sentence state "*every* line" of service, as Defendant puts it. *See* Dkt. 70 at 29 n.9 (emphasis added).

[12] *See* https://www.t-mobiledisputeresolution.com/en/TMobile/OptOut (emphasis added) (retrieved March 9, 2026).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

However, even if Defendant's interpretation was correct, this requirement applies only to each "*line of service*"—not each product or device which was purchased. *Id.* (emphasis added). Defendant provides no reason to interpret each "line of service" to also include each product and device, especially since, in the previous line, the provision separately refers to "**PRODUCT[S] OR DEVICE[S]**," as well as "**LINE[S] OF SERVICE.**" *Id.* (emphasis in original). Thus, Defendant's argument that Marcus's opt out is not valid because of an alleged purchase of a SIM card is irrelevant to the Court's analysis.

### C. The Parties Did Not Agree To Delegate Issues Of Arbitrability To The Arbitrator Where There Is No Contract To Arbitrate

Knowing this argument was coming, T-Mobile's moving papers claim that whether Plaintiffs opted out of the Provision is an issue of contract validity, to be determined by the arbitrator, and not an issue of contract formation to be decided by the Court. Defendant's argument is misplaced. The Fourth Circuit affirmed in *Johnson v. Continental Fin. Co.* that "it was for the court, not the arbitrator, to determine whether the contract was illusory" because a "claim that a contract is illusory calls into question the very existence of the contract." 131 F.4th at 178; *see also In re T-Mobile 2022*, 2026 WL 493643, at *6. Therefore, whether the opt-out provision is illusory must be resolved by this Court.[13]

A delegation provision is meaningless if the parties did not agree to it. So, while T-Mobile points to purported delegation provisions in its various written agreements with Plaintiffs as evidence that the parties agreed to send issues of scope and enforcement to an

---

[13] The two cases relied upon by Defendant allegedly to the contrary are inapposite, as neither involved a claim of an illusory opt out provision, but rather addressed issues related to contract termination. *See Collett v. Ancestry.com DNA LLC*, 2019 WL 13253477, at *3 (N.D. Cal. Dec. 19, 2019) ("Plaintiffs are not arguing that the 2019 Terms do not constitute a validly formed contract between the parties . . . whether plaintiffs successfully opted out of the contract is an issue of contract termination, not formation"); *Ahlstrom v. DHI Mortg. Co. GP, Inc.*, 2018 WL 6268876, at *3 (N.D. Cal. Nov. 30, 2018).



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

arbitrator,[14] the Court cannot and need not reach that issue unless it finds "**clear and unmistakable** evidence that the parties agreed to arbitrate arbitrability." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022) (emphasis added) (internal quotation omitted). "[C]ontract-*formation* issues are always matters for judicial resolution," and therefore "'always include' whether an arbitration agreement was formed, even in the presence of a delegation clause." *Id.* (citing *Granite Rock Co.*, 561 U.S. at 297). Thus, "a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause." *Id.*

This Court—not an arbitrator—must therefore determine whether the parties in this case formed an agreement to arbitrate. *See id.* (noting that while issues such as the "scope" and "enforceability" of an arbitration clause can be committed to an arbitrator through a "[delegation] provision," courts must "always" resolve "whether the clause was agreed to" by the parties). Because Plaintiffs have challenged the formation of the alleged arbitration agreements, the Court must resolve Plaintiffs' challenges. *See also Anhui Powerguard Tech. Co. v. DRE Health Corp.*, 95 F.4th 1146, 1151 (8th Cir. 2024) (explaining that "the absence of an agreement to arbitrate necessarily forecloses any argument that the parties delegated the issue of arbitrability to an arbitrator."). As set forth above, T-Mobile has failed to establish that the parties formed an agreement to arbitrate. The Court, therefore, does not need to reach the issue of delegation.

## III. Plaintiffs Timely Opted Out of Arbitration

### A. Marcus Timely Opted Out Of Arbitration

Marcus timely opted out of his lines ending in 9621, 1824, 0201, 3409, and 9354. Marcus opted out of each of these lines within 30 days, thereby fulfilling the requirements of

---

[14] This is impossible to tell for Plaintiff Kahhan, for whom T-Mobile has not produced a signed agreement.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

the opt out provision. *See* Marcus Decl. ¶¶ 5–8. Defendant does not dispute this. *See* Dkt. 72 ¶¶ 97(b)–(e).

Despite Marcus' clear opt-out, Defendant relies on its erroneous interpretation of the T&Cs to argue that Marcus failed to opt out of these lines because he did not opt out of arbitration for a SIM card Defendant alleges he purchased. First, Marcus did not purchase the SIM card upon which Defendant relies on for this position. Marcus "did not sign a purchase contract for a SIM card device on November 13, 2019." Marcus Decl. ¶ 3. Marcus states that while the receipt "reflects that the SIM card purchased was paid for with a Chase Visa card[,] [t]hat is not my Visa Chase card," and the "signature on the November 13, 2019 purchase contract . . . is not mine." *Id.* ¶ 4. Further, Marcus states that "I have never had 23 voice lines with T-Mobile." *Id.* ¶ 9. These facts establish that Marcus opted out of arbitration and cannot be compelled to go to arbitration. At a minimum, there are disputed facts sufficient to defeat T-Mobile's motion to compel Marcus to arbitrate his claim.

### B. Hyaduck, Kahhan, Oddo, and Marcus Cannot Be Compelled To Arbitrate Based On The Current Factual Record

Even if Defendant's interpretation of the T&Cs is correct, disputed factual issues preclude compelling Hyaduck, Kahhan, Oddo, and Marcus[15] from being compelled to arbitrate.

Hyaduck "had been a Sprint customer since May 14, 2020." Dkt. 69 ¶ 22. Defendant states that Hyaduck "migrated from Sprint to T-Mobile on or around January 14, 2021" and "executed Service Agreements on January 14, 2021 and January 15, 2021." Dkt. 72 ¶ 75. The T&Cs applicable when Hyaduck opened these lines provides that opting out must be done "**<u>WITHIN 30 DAYS</u> FROM THE EARLIER OF THE DATE YOU PURCHASED A DEVICE FROM US OR THE DATE YOU ACTIVATED A NEW LINE OF SERVICE**

[15] For account ending in 9597.



MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

**(the "Opt Out Deadline")."** Dkt. 72-42 at 5 (emphasis in original).[16] However, Defendant does not provide the Sprint T&Cs that were applicable when Hyaduck originally signed on with Sprint in 2020. Accordingly, it is impossible to tell whether those T&Cs even contained an arbitration provision, let alone an opt-out provision. If they did not, Hyaduck could never have opted out on his original line, which would have made it impossible to opt-out of the lines he subsequently opened with T-Mobile under T-Mobile's explanation of how their opt-out provision works. This is precisely what another court recently held in a case against T-Mobile involving a nearly identical provision. *See In re T-Mobile 2022*, 2026 WL 493643, at *9 (T-Mobile's opt out provision illusory as to client who originally opened service with Sprint and the applicable Sprint T&Cs did not contain an opt out provision).

It is also impossible to determine on this record whether Kahhan, Oddo, and Marcus timely opted out of arbitration. As set forth above, Defendant has not provided Oddo's original service agreement, or the service agreement for Kahhan's claim (account ending in 3421, *see* Dkt. 72-3 at 1) or Marcus' claim (account ending in 9597, *see* Dkt. 72-5 at 1). Without these service agreements, it is impossible to determine whether these three were ever on notice of their opportunity to opt out of arbitration when they first opened their accounts. If not, they could not be expected to opt out timely.

## IV. Plaintiffs' Claims Should Not Be Stayed Pending Arbitration

In the event this Court finds that some of Plaintiffs' claims are subject to arbitration, Defendant provides no reason why the remainder of their claims should be stayed. As set forth above, a party can be compelled to arbitrate only issues it specifically agreed to submit

---

[16] "Us" is defined in the T&Cs as "T-Mobile USA, Inc., and our controlled subsidiaries, assignees, and agents." Dkt. 72-42 at 2. Sprint Corporation merged with T-Mobile in 2020. *In re T-Mobile 2022*, 2026 WL 493643 at *8 n.11. In the recent *T-Mobile 2022* case, which involved an almost identical T-Mobile opt out provision, the court found that "us" includes Sprint and that the provision encompasses Sprint's T&Cs prior to its merger with T-Mobile. *Id.* at *9. The same is true here.



McNaul Ebel PLLC
600 University Street, Suite 2700
Seattle, Washington 98101-4151
(206) 467-1816

to arbitration. *Kaplan*, 514 U.S. at 945. Accordingly, any claims not found to be arbitrable must proceed before the Court.

**CONCLUSION**

As Defendant has failed to meet its burden, the Court should deny Defendant's Motion.

* * *

I hereby certify that this memorandum contains 8,397 words in accordance with Local Civil Rules.

DATED this 10th day of March, 2026.

McNAUL EBEL PLLC

By: *s/ Kaleigh N. Boyd*
Kaleigh N. Boyd, WSBA #52684
600 University Street, Suite 2700
Seattle, Washington 98101
Phone: (206) 467-1816
Fax: (206) 624-5128
Email: kboyd@mcnaul.com

Greg M. Kohn, *pro hac vice*
Lisa R. Considine, *pro hac vice*
David J. DiSabato, *pro hac vice*
NAGEL RICE, LLP
Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
gkohn@nagelrice.com
lconsidine@nagelrice.com
ddisabato@nagelrice.com

*Attorneys for Plaintiffs and the Proposed Class*