HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHRISTOPHER ODDO, HARRY HYADUCK, SR., LARRY KAHHAN, GERALD DWYER, and SAM MARCUS, *on behalf of themselves and all other persons similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>T-MOBILE USA, INC.,<br><br>Defendant. | CASE NO. 2:25-cv-01651-RAJ<br><br>ORDER |

## I. INTRODUCTION

THIS MATTER comes before the Court on Defendant T-Mobile USA, Inc.'s Motion to Compel Arbitration and Stay Action, Dkt. No. 70 (the "Motion"), and Motion to Stay Discovery, Dkt. No. 73. The Court has reviewed the motions, the submissions in support of and in opposition to the motions, and the balance of the record. Defendant requested oral argument, but the Court finds oral argument is not necessary to resolve the motions. For the reasons set forth below, the Court **GRANTS** the Motion to Compel Arbitration and **DENIES AS MOOT** the Motion to Stay Discovery.

## II. BACKGROUND

### A. The Parties, Plaintiffs' Claims, and Procedural History

Defendant T-Mobile USA, Inc. ("T-Mobile") provides wireless communication services throughout the United States. Dkt. No. 72 ¶ 3. Plaintiffs Christopher Oddo of New Jersey, Harry Hyaduck, Sr., of Georgia, Larry Kahhan of Nevada, Gerald Dwyer of Pennsylvania, and Sam Marcus of New York are current T-Mobile customers. *Id.* ¶¶ 4–5; Dkt. No. 69 ¶ 1.

Plaintiffs allege that they enrolled in certain T-Mobile service plans "[b]ased upon T-Mobile's representations that the rates offered with respect to certain plans were guaranteed to last for life or as long as the customer wanted to remain with that plan." *Id.* ¶ 4. They allege that T-Mobile nonetheless raised the rates on their plans beginning in May 2024. *Id.* ¶¶ 4, 9, 16–17 (Oddo), 23–25 (Hyaduck), 29–30 (Kahhan), 35–36 (Dwyer), 42 (Marcus). On behalf of a putative nationwide class and five state subclasses, Plaintiffs bring claims for common-law fraud, negligent misrepresentation, and false advertising, as well as under the consumer protection statutes of New Jersey, Georgia, Pennsylvania, Nevada, New York, and Washington. *Id.* ¶¶ 54–127.

In July 2024, Plaintiffs Oddo, Hyaduck, Kahhan, and Dwyer originally filed this action in the United States District Court for the District of New Jersey. Dkt. No. 1. Shortly thereafter, T-Mobile moved to dismiss for lack of personal jurisdiction or, in the alternative, to compel arbitration. Dkt. No. 11. The court denied the prior motion to compel arbitration without prejudice, Dkt. No. 14, and on August 28, 2025, the court transferred the case to this district. Dkt. Nos. 49, 50.

On December 5, 2025, Plaintiffs filed the First Amended Complaint, which added Plaintiff Marcus. Dkt. No. 69 ("FAC"). T-Mobile renewed its Motion to Compel Arbitration as to all five Plaintiffs' claims, Dkt. No. 70, and simultaneously moved to stay discovery while the Motion was pending, Dkt. No. 73. Plaintiffs opposed the Motion, Dkt. No. 75, and T-Mobile filed its reply in support of the Motion, Dkt. No. 80.

### B. T-Mobile's Terms and Conditions

T-Mobile provides mobile phone service to customers subject to its Terms and Conditions ("T&Cs"), which T-Mobile updates "from time to time." Dkt. No. 72 ¶¶ 6–7. According to T-Mobile, "[e]very version of [the T&Cs] that has been [in] effect since Plaintiffs first activated service with T-Mobile has included an arbitration agreement, class action waiver, jury [trial] waiver, opt-out provision, and has incorporated the [American Arbitration Association ("AAA")] rules." *Id.* ¶ 51. Three versions of the T&Cs are relevant to the Motion: (1) the March 2021 T&Cs, in effect from March 1, 2021, to May 14, 2023, Dkt. No. 72-41 ("2021 T&Cs"); (2) the May 2023 T&Cs, in effect from May 15, 2023, to July 31, 2025, Dkt. No. 72-39 ("2023 T&Cs"); and (3) the August 2025 T&Cs, effective August 1, 2025, Dkt. No. 72-38 ("2025 T&Cs").

#### 1. The Arbitration Provisions[1]

The 2023 T&Cs advise customers that they "contain important information about your relationship with us, including individual mandatory binding arbitration of disputes between us, instead of class actions or jury trials." Dkt. No. 72-39 at 2. Then, they explain how a customer accepts them:

> You accept these T&Cs by doing any of the following things:
>
> - giving us a written or electronic signature or confirmation, or telling us orally that you accept;
> - activating, using, or paying for the Service or a Device; or
> - opening the Device box.
>
> If you don't want to accept these T&Cs, don't do any of these things.

*Id.* at 3.

Then, under the heading "**HOW DO I RESOLVE DISPUTES WITH T-MOBILE?**", the 2023 T&Cs provide:

---

[1] The relevant arbitration provisions are materially similar across all three versions of the T&Cs. For the purposes of this Order, the Court cites them as they appear in the 2023 T&Cs except as noted.

> By accepting these T&Cs, you are agreeing to resolve any dispute with us through individual binding arbitration or small claims dispute procedures (unless you opt out), and to waive your rights to a jury trial and to participate in any class action suit.
>
> ***Individualized Dispute Resolution and Arbitration.*** **YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL CLAIMS OR DISPUTES, OF ANY NATURE, INCLUDING TORT AND STATUTORY CLAIMS, IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, PRIVACY OR DATA SECURITY PRACTICES, OUR SERVICES, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY INDIVIDUAL BINDING ARBITRATION OR IN SMALL CLAIMS COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. THE ARBITRATOR MUST FOLLOW THIS AGREEMENT AND CAN AWARD, ON AN INDIVIDUAL BASIS, THE SAME DAMAGES AN[D] RELIEF AS A COURT (INCLUDING ATTORNEYS' FEES[).]**
>
> … You and we each also agree that the Agreement affects interstate commerce so that the Federal Arbitration Act and federal arbitration law, not state law, apply and govern the enforceability of this dispute resolution provision (despite the general choice of law provision set forth below).

*Id.* at 7–8.

However, customers may opt out of arbitration as follows:

> Notwithstanding the above, **YOU MAY CHOOSE TO PURSUE YOUR CLAIM IN COURT AND NOT BY ARBITRATION IF YOU OPT OUT OF THESE ARBITRATION PROCEDURES WITHIN 30 DAYS FROM THE EARLIER OF THE DATE YOU PURCHASED A PRODUCT OR DEVICE FROM US OR THE DATE YOU ACTIVATED A NEW LINE OF SERVICE (the "Opt Out Deadline")**. You must opt out by the Opt Out Deadline for each line of Service. You may opt out of these arbitration procedures by calling 1-866-323-4405 or online at www.T-Mobiledisputeresolution.com. **Any opt-out received after the Opt Out Deadline will not be valid and you will be required to pursue your claim in arbitration or small claims court.**

*Id.* at 8.

Finally, the 2023 T&Cs provide that "[t]he arbitration of all disputes will be administered by the AAA under its Consumer Arbitration Rules in effect at the time the

arbitration is commenced …." *Id.* at 9. They further provide that:

> The arbitrator will have the power to rule on their own jurisdiction, including any issues concerning the existence, validity, or scope of either this Agreement or the arbitration clause, including whether any claim is subject to arbitration ….

*Id.* at 10.

The 2021 and 2025 T&Cs contain materially similar opening disclosure, acceptance, opt-out, and AAA provisions. Dkt. No. 72-41 at 2–6; Dkt. No. 72-38 at 3–4, 11–12. There are two relevant differences:

First, the 2021 T&Cs contain no provision expressly delegating questions of arbitrability to the arbitrator. Instead, according to T-Mobile, the 2021 T&Cs rely on the incorporation of the AAA's Consumer Arbitration Rules for that purpose. Dkt. No. 72-41 at 6; *see* Dkt. No. 70 at 10 n.3.

Second, the wording of the arbitration clause varies from the 2023 T&Cs. The 2021 T&Cs cover "**ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, OUR SERVICES, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES** …." Dkt. No. 72-41 at 4–5. And the 2025 T&Cs cover "**ALL CLAIMS AND DISPUTES BETWEEN YOU AND T-MOBILE**," a category that "**INCLUDES, BUT IS NOT LIMITED TO**," claims "**IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT … OUR SERVICES, DEVICES, OR PRODUCTS, AND BILLS OR CHARGES**." Dkt. No. 72-38 at 11.

**2. Notification of Changes to the Terms and Conditions**

T-Mobile notified customers of both updates to the T&Cs. For the 2023 T&Cs, T-Mobile sent account holders an email with the subject line "We're updating our terms and conditions," which stated:

> We've updated our Terms and Conditions and changes will take place May 15, 2023. By using your service after that date, you'll agree to the updated

> Terms and Conditions. Please read our Terms & Conditions at **T-Mobile.com/terms-conditions**. For additional information, visit our FAQ page at **http://T-Mobile.com/support/account/terms-and-conditions-updates**.

Dkt. No. 72-40 at 2. For the 2025 T&Cs, T-Mobile sent a text message and placed a notice on each customer's August 2025 bill, both stating: "We've updated our Terms and Conditions and Privacy Notices. Get the details and learn about your options in the Privacy Dashboard at secure.t-mobile.com/terms." Dkt. No. 72 ¶¶ 11–12; Dkt. Nos. 72-1–72-5. That link led to a website announcing the update and linking to the 2025 T&Cs. Dkt. No. 72 ¶ 11.

### C. Plaintiffs' Individual Agreements and Opt-Out Requests

In addition to the T&Cs, T-Mobile customers may sign several types of written agreements. When a customer activates service or adds a line, the customer typically signs a "Service Agreement" detailing their rate plan and monthly charges. *See, e.g.,* Dkt. No. 72-16 at 2. And a customer who acquires a phone from T-Mobile may pay for it over time via monthly installments under an Equipment Installment Plan ("EIP") or a Lease Agreement. *See, e.g.,* Dkt. Nos. 72-17, 72-23.

#### 1. Plaintiffs Oddo, Hyaduck, and Dwyer

According to T-Mobile's records, Oddo first activated service in December 2011. Dkt. No. 72 ¶ 69. In March 2017, he signed a Service Agreement. Dkt. No. 72-16. Between 2016 and 2021, he signed six Lease Agreements and five EIPs. Dkt. Nos. 72-17–72-27.

Hyaduck was a Sprint customer until January 2021, when he moved his service to T-Mobile. Dkt. No. 69 ¶ 22; Dkt. No. 72 ¶ 75. He signed two Service Agreements: the first one on January 14, 2021, Dkt. No. 72-28; and the second one on January 15, 2021, Dkt. No. 72-29. He also signed two EIPs on January 15, 2021. Dkt. Nos. 72-30–72-31.

Dwyer switched to T-Mobile in August 2017. Dkt. No. 69 ¶ 34; Dkt. No. 72 ¶ 86. On August 26, 2017, he signed a Service Agreement. Dkt. No. 72-33. He later signed two

EIPs in December 2019. Dkt. Nos. 72-34–72-35.

Each Service Agreement provides that **"[b]y accepting this form, activating or using T-Mobile service, you agree that**," among other terms: "Your '**Agreement**' with T-Mobile includes: (a) this Service Agreement; (b) T-Mobile's 'Terms and Conditions'; and (c) any terms specific to your Rate Plan or service. **You can obtain copies of T-Mobile's Terms and Conditions … at www.T-Mobile.com … or by calling Customer Care** …. You agree you have received and read your Agreement." *E.g.,* Dkt. No. 72-16. Of the four Service Agreements, three further state that "**T-Mobile requires ARBITRATION OF DISPUTES UNLESS YOU OPT-OUT WITHIN 30 DAYS OF ACTIVATION.** For details see www.T-Mobile.com/terms-conditions." *Id.*; Dkt. Nos. 72-29, 72-33. The fourth agreement similarly states, "**T-MOBILE REQUIRES ARBITRATION OF DISPUTES UNLESS YOU PREVIOUSLY OPTED-OUT PURSUANT TO T-MOBILE'S TERMS AND CONDITIONS**." Dkt. No. 72-28.

Furthermore, the EIPs and Lease Agreements contain their own arbitration provisions. Each EIP provides that "WE AND YOU EACH AGREE THAT … ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THIS AGREEMENT, OUR PRIVACY POLICY, OUR SERVICES, EQUIPMENT, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT." *E.g.,* Dkt. No. 72-30 at 4. The EIPs also provide for arbitration by the AAA, and they permit the customer to opt out within "30 DAYS FROM THE EARLIER OF THE DATE OF YOUR SIGNATURE TO THIS AGREEMENT, THE DATE YOU PURCHASED EQUIPMENT FROM US OR THE DATE YOU ACTIVATED A NEW LINE." *Id.* The Lease Agreements contain materially similar arbitration and opt-out provisions. *E.g.,* Dkt. No. 72-17 at 6–7.

### 2. Plaintiffs Kahhan and Marcus

T-Mobile has not produced any Service Agreement, EIP, or Lease Agreement for Plaintiffs Kahhan or Marcus. According to T-Mobile, Kahhan activated service at a Costco

store in February 2013. Dkt. No. 72 ¶¶ 79–80. T-Mobile asserts that under its regular practice, Kahhan could not have done so without "sign[ing] a Service Agreement or otherwise accept[ing] and agree[ing] to T-Mobile's Terms and Conditions (including the arbitration agreement)." *Id.* ¶¶ 80–81. Moreover, T-Mobile contends that in April 2023, it sent Kahhan "an email notifying him of the updated 2023 T&Cs and informing him that he accepted them by continuing to use or paying for his T-Mobile service." *Id.* ¶ 83; *see also id.* ¶¶ 82, 84 (similar assertions as to 2021 and 2025 T&Cs). Plaintiffs allege Kahhan "never received any notification from T-Mobile regarding their Terms and Conditions." Dkt. No. 69 ¶ 31.

Marcus activated service in February 2016.[2] *Id.* ¶ 38; Dkt. No. 72 ¶ 90. As with Kahhan, T-Mobile asserts that Marcus could not have activated service without signing a Service Agreement or otherwise accepting or agreeing to its Terms and Conditions, including the arbitration agreement. *Id.* ¶ 91. T-Mobile also contends that on November 13, 2019, Marcus signed a purchase contract for a SIM card device that incorporated the T&Cs. Dkt. No. 72-36. Marcus attests that he did not make that purchase. Dkt. No. 77 ¶¶ 3–4.

**3. Opt-Out Requests**

Oddo, Hyaduck, Kahhan, and Dwyer each submitted a request to opt out of arbitration in June 2024. Dkt. No. 72 ¶ 96; Dkt. No. 72-37 at 2. According to the FAC, they did so "upon counsel's conducting a Google search and finding this provision in the 'Terms and Conditions' dated May 15, 2023." Dkt. No. 69 ¶ 45. Marcus submitted eight opt-out requests over the course of his relationship with T-Mobile. Dkt. No. 72 ¶ 97; Dkt. No. 72-37 at 2. Each Plaintiff received an automated email stating their request "has been processed and will be effective subject to the [T&Cs]." Dkt. Nos. 76-1–76-5.

[2] The FAC alleges that Marcus is a citizen of New York, Dkt. No. 69 ¶ 1, but T-Mobile's records reflect a billing address in Illinois, Dkt. No. 72 ¶ 5; Dkt. No. 72-37 at 2. For purposes of the Motion, T-Mobile accepts the FAC's residency allegations. Dkt. No. 70 at 9 n.2.

## III. LEGAL STANDARD

When deciding whether to compel arbitration, a court must generally "determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citations omitted). "However, these gateway issues can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably* provide otherwise.'" *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). A court "should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)).

The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). The party opposing arbitration bears the burden of showing that the agreement is not enforceable. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000).

If both conditions are met, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration" on the issues they have agreed to arbitrate. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Under these circumstances, the court is required to stay the proceedings pending arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

## IV. DISCUSSION

Whether an agreement to arbitrate was formed is always a question for the Court, even where the agreement contains a delegation clause. *Caremark*, 43 F.4th at 1030. If an agreement was formed and the party resisting arbitration does not specifically challenge

the delegation clause, "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Id.*

"In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015). Under Washington's choice-of-law rules, the threshold question is whether an actual conflict exists between the laws of the interested states. *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120 (Wash. 2007). If there is none, the Court applies the "presumptive local law." *Id.* Here, the T&Cs select the law of the state of each customer's billing address. Dkt. No. 72-39 at 11. However, both parties agree that the laws of the relevant states do not differ materially on contract formation. Dkt. No. 70 at 17 n.4; Dkt. No. 75 at 6 n.2. Absent an actual conflict, the Court applies Washington law.

**A. Existence of a Valid Arbitration Agreement**

**1. All Plaintiffs Accepted the 2023 T&Cs Through Their Conduct**

T-Mobile argues that each Plaintiff accepted the 2021, 2023, and 2025 T&Cs by continuing to use and pay for service after receiving notice that doing so would constitute acceptance of their terms. Dkt. No. 70 at 18–23. The Court agrees as to the 2023 T&Cs and need not reach the other versions.

Assent to a contract "may be made wholly or partly by written or spoken words or by other acts or failure to act." Restatement (Second) of Contracts § 19 (1981). Where terms are presented by notice, "the existence of mutual assent turns on whether the consumer had reasonable notice of the terms of service agreement." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (applying Washington law). A contract is formed if (1) the consumer receives reasonably conspicuous notice of the terms and (2) the

consumer takes some action that unambiguously manifests assent to them. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

Both requirements are met. In April 2023, T-Mobile emailed each Plaintiff that its T&Cs would change on May 15, 2023. Dkt. No. 72-40 at 2; Dkt. No. 72 ¶ 24. The email stated that "[b]y using your service after that date, you'll agree to the updated Terms and Conditions," and hyperlinked the new terms. Dkt. No. 72-40 at 2. The 2023 T&Cs disclosed arbitration in their opening paragraph and confirmed that using or paying for service constitutes acceptance. Dkt. No. 72-39 at 2–3.

For their part, Plaintiffs do not dispute that they continued to use and pay for T-Mobile service after May 15, 2023. Indeed, their claims arise from increases to the very bills they continued to pay. *See* Dkt. No. 69 ¶¶ 16–17, 23–25, 29–30, 35–36, 42. Notably, this Court has previously found that a plaintiff assented to T-Mobile's 2023 T&Cs on similar facts. *Franck v. T-Mobile USA, Inc.*, No. 2:24-cv-00234-RAJ, 2024 WL 4188971, at *2 (W.D. Wash. Sept. 12, 2024) (concluding plaintiff "assented to the most recent version of the T&Cs after making payments following T-Mobile's notifying its customers of the updated contractual language"); *see also Rendon v. T-Mobile USA, Inc.*, 747 F. Supp. 3d 1314, 1319 (C.D. Cal. 2024) (same email notice).

Plaintiffs' counterarguments are unpersuasive.

*First*, Plaintiffs contend that the notices did not mention arbitration or opt-out rights and told customers only to "[g]et the details and learn about your options." Dkt. No. 75 at 12. As an initial matter, that language was in the notices for the 2025 T&Cs, not the 2023 T&Cs. *Compare* Dkt. No. 72 ¶ 11, *with* Dkt. No. 72-40 at 2. In any event, even if "the email did not say specifically that the arbitration agreement would be updated, reasonable notice does not require the email to discuss every revision." *Ireland-Gordy v. Tile, Inc.*, No. 25-403, 2026 WL 594859, at *4 (9th Cir. Mar. 3, 2026) (unpublished). The email notice for the 2023 T&Cs informed Plaintiffs that their terms were changing, where to review them, and what conduct would bind them. And the first paragraph of the 2023

T&Cs disclosed the arbitration requirement. Dkt. No. 72-39 at 2. That Plaintiffs may not have followed the link does not negate their assent. *See G.G. v. Valve Corp.*, 799 F. App'x 557, 558 (9th Cir. 2020) ("[U]nder Washington law, courts presume that parties to an agreement have read all parts of the entire contract and intend what is stated in its objective terms.").

*Second*, Plaintiffs' allegations in the FAC suggesting they never received notice of the T&Cs, Dkt. No. 69 ¶¶ 31, 44, cannot create a genuine dispute when T-Mobile's records reflect that the email notice for the 2023 T&Cs was sent to each Plaintiff, Dkt. No. 72 ¶¶ 24, 83. Whether a Plaintiff received the email notice (or not) is a matter within his own knowledge, yet no Plaintiff submitted a declaration denying receipt. Marcus submitted a declaration, but it does not address the notices at all. *See* Dkt. No. 77.

*Third*, Plaintiffs argue that paying their bills cannot "correct" deficiencies in the formation of their original Service Agreements. Dkt. No. 75 at 11. But Plaintiffs' acceptance of the 2023 T&Cs formed an independent agreement to arbitrate that does not depend on the validity of any earlier agreement. The Court therefore need not address whether T-Mobile's evidence of its "regular practice and procedure" establishes the terms of Kahhan's or Marcus's original activation agreements or evaluate the effect of Marcus's 2019 SIM card receipt.[3]

As a result, the Court finds that all five Plaintiffs agreed to the 2023 T&Cs, including the arbitration provisions.

### 2. Plaintiffs Oddo, Hyaduck, and Dwyer Also Signed Agreements to Arbitrate

For Oddo, Hyaduck, and Dwyer, their signed agreements supply an independent basis for the same conclusion. *See supra* Section II.C.1. Each signed EIPs or Lease Agreements containing a standalone arbitration provision. *E.g.,* Dkt. No. 72-23 at 5; *see*

[3] For the same reason, the Court does not rely on the 2025 T&Cs, nor does it address Plaintiffs' argument that those terms cannot govern claims that predate them. *See* Dkt. No. 75 at 12 n.6.

*also* Dkt. No. 72 ¶¶ 73–74, 78, 89. Plaintiffs do not dispute that they signed these agreements. Because a party who signs a contract is presumed to know and assent to its terms, *G.G.*, 799 F. App'x at 558, the EIPs and Lease Agreements independently establish that Oddo, Hyaduck, and Dwyer agreed to arbitrate.

The Service Agreements likewise constitute these Plaintiffs' agreement to arbitrate. Plaintiffs argue that they lacked a reasonable opportunity to review the T&Cs incorporated into their Service Agreements. Dkt. No. 75 at 6–11. But each Service Agreement expressly incorporates the T&Cs, tells the customer where to obtain them, states on its face that T-Mobile requires arbitration, and recites that the customer has "received and read" the Agreement. *E.g.*, Dkt. No. 72-16 at 2; *see Satomi Owners Ass'n v. Satomi, LLC*, 225 P.3d 213, 225 (Wash. 2009) ("If the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that document becomes part of their contract."). And no Plaintiff attests that he was denied an opportunity to review the T&Cs. The Court therefore finds that Oddo, Hyaduck, and Dwyer also agreed to arbitrate by signing their Service Agreements.

### 3. Plaintiffs' Opt-Out Arguments Do Not Defeat Formation

In their response, Plaintiffs argue that T-Mobile's opt-out provision is illusory because it is impossible to opt out, so no agreement was formed. Dkt. No. 75 at 13–19. T-Mobile argues that Plaintiffs' opt-out-based arguments concern whether they terminated an existing agreement, not whether one was formed, and are therefore delegated to the arbitrator. Dkt. No. 70 at 27–28. The Court agrees with T-Mobile.

The decision on which Plaintiffs rely does not fit this case. *In re T-Mobile 2022 Customer Data Sec. Breach Litig.* treated opt-out questions as going to formation only where the party moving to compel arbitration "points to an opposing party's failure to opt out as the sole evidence of assent." 829 F. Supp. 3d 700, 712–13 (W.D. Mo. 2026), *appeal dismissed*, No. 26-1430 (8th Cir. May 29, 2026). "In that scenario, if … it is technically impossible to opt-out, then the failure to opt out is not a manifestation of assent because

the offeree had no choice." *Id.* Here, T-Mobile does not rely on Plaintiffs' failure to opt out as evidence of assent. Instead, it relies on their continued use of service after notice of the T&Cs and, for three Plaintiffs, on their signatures on written agreements. The opt-out provision in the T&Cs gives an existing party—who has already agreed to arbitration—a means to withdraw from an obligation already undertaken. Whether it was successfully exercised is thus "an issue of contract termination, not formation." *Collett v. Ancestry.com DNA LLC*, No. 19-CV-03743-RS, 2019 WL 13253477, at *3 (N.D. Cal. Dec. 19, 2019). "Thus, an arbitrator, not a court, must decide whether the opt-out was valid." *Id.*

Nor are Plaintiffs' agreements illusory. Under Washington law, "a contract is illusory only if it lacks all consideration and mutuality of obligation, e.g., the promisor has *no* obligations with regard to *any* parts of the contract." *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1176 (W.D. Wash. 2014). Here, T-Mobile provides wireless service in exchange for payment, and both parties promise to arbitrate their claims against the other. *See* Dkt. No. 72-39 at 7 ("YOU AND WE EACH AGREE …."). Plaintiffs' objection concerns their ability to exercise an option to reject arbitration. It does not show that T-Mobile's promises are illusory, and Plaintiffs cite no authority holding that an agreement supported by mutual obligations becomes illusory because the promisee found an opt-out provision difficult to use.

The remaining questions Plaintiffs raise—such as whether Plaintiffs' opt-outs were timely or effective—go to the validity, enforceability, termination, or scope of their agreements, not to formation. As explained below, the parties delegated those questions to the arbitrator.

**B. Delegation of Scope and Enforceability**

Having found that Plaintiffs agreed to arbitrate, the Court turns to whether the parties delegated the remaining gateway questions to the arbitrator.

The 2023 T&Cs answer that question clearly: "The arbitrator will have the power to rule on their own jurisdiction, including any issues concerning the existence, validity, or

scope of either this Agreement or the arbitration clause, including whether any claim is subject to arbitration…." Dkt. No. 72-39 at 10. Indeed, this Court has previously decided that this provision of the 2023 T&Cs "delegates the arbitrability issue to an arbitrator." *Franck*, 2024 WL 4188971, at *3. In addition, the T&Cs, EIPs, and Lease Agreements incorporate the AAA's Consumer Arbitration Rules. *See* Dkt. No. 72-39 at 9; Dkt. No. 72-30 at 4; Dkt. No. 72-17 at 7. The Ninth Circuit has held that incorporating the AAA rules "constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability," *Brennan*, 796 F.3d at 1130, and courts in this district have applied that rule to T-Mobile's consumer agreements, *see, e.g., Bennett v. T-Mobile USA, Inc.*, No. 2:22-cv-01805-LK, 2024 WL 229580, at *8 (W.D. Wash. Jan. 22, 2024).

Where a contract delegates arbitrability, a court "possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019). The Court therefore defers to the arbitrator on the scope and enforceability of the parties' agreements, including Plaintiffs' opt-out arguments.

**C. Stay of Proceedings Pending Arbitration**

Finally, because all of Plaintiffs' claims are referred to arbitration and T-Mobile has requested a stay, *see* Dkt. No. 70 at 30, the Court must stay this action pending arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

//

//

//

//

//

//

//

//

//

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Compel Arbitration, Dkt. No. 70, and **STAYS** this case pending arbitration. The Court **DENIES AS MOOT** Defendant's Motion to Stay Discovery, Dkt. No. 73.

Pursuant to the language provided in the arbitration provision, the arbitration of all disputes will be administered by the American Arbitration Association under its Consumer Arbitration Rules in effect at the time arbitration commences. The parties are directed to advise the Court of the status of arbitration within **ninety (90) days** of this Order. If the parties fail to commence arbitration within **twelve (12) months** of this Order, the Court will dismiss the underlying claims and terminate the case. *See Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 962–63 (9th Cir. 2007).

Dated this 29th day of September, 2026.

The Honorable Richard A. Jones
United States District Judge